Thank you, Your Honor. Good morning, Your Honors. Robert Gerstein, now for appellants. May it please the Court, the extraordinary stringency of the rule regarding the duty to defend, the liability ensures duty to defend, that stringency creates a very narrow question in this case. It's a two-part question. The first part of it is, did the complaint create any possibility of potentially covered liability? The standard there, the question is whether on any conceivable theory, that complaint raised a single issue which could bring it within policy coverage. The answer, surely, here is yes. Looking at the complaint, it states that the insured drenched the plaintiffs in the underlying case with gasoline and that it ignited, but it is completely indeterminate as to whether that was done willfully or negligently. It's pled both ways, and there are no additional facts stated in the complaint that would lead to a conclusion one way or another. So is it that the either or is bound solely by the framing of the complaint by the plaintiff in making the coverage determination, or may the insurer or look to other evidence in deciding whether the exclusion applies? Your Honor, there's no question that the insurer may look to other evidence which has developed by its investigation, and that's the second part of the question. The question there is whether that additional extrinsic evidence, which the insurer has found, completely negates any possibility for coverage. So that, as the California Supreme Court said in the Montrose case, there is no potential for coverage. You have to look, of course, at the facts as they were known to the insurer at the time the insurer denied defense. And at that time, the facts that they knew, in fact, created further indeterminacy, certainly did not rule out the possibility of covered liability. I have a little difficulty understanding how, at the end of the day, one is left with any impression but for an impression that he intended to douse these folks with gasoline in order to blind them. And it turns out that he happened to burn them as well. But so what? His intent was to harm them. Your Honor, he executed a number of steps before he did that in order to make sure that he could catch them and toss this gasoline on them. Your Honor, conceded that he threw the gasoline intentionally, with the purpose of blinding them, in order to regain property which had been extorted from him. Now, one point there is that the fact that he was acting to regain his property and doing so promptly after it had been taken from him raises the possibility of justification under California law. That's one- I'm so very prompt when, meanwhile, you have gone back across the border, gone to a store to buy the gasoline, got the cup to put it in, recrossed the border, found the officials in their car, and then gone up to them. Well, the record says, Your Honor, that that all occurred within an hour of the time of the extortion. The question here is, is it possible? Not a question of whether this Court might conclude that, yes, that shows that there was no possibility of justification. But was there a possible defense of justification for that at the time, on the basis of the facts known at this early stage when defense was denied? And the answer is, Your Honor, we'd say certainly the possibility was not negated. Now, furthermore, Your Honor, even- Does it have to be beyond all doubt? Is that your position, that there can be absolutely no theoretical possibility that there might be an exclusion here? Well, Your Honor, a theoretical possibility may go too far. But certainly a possibility raised by the facts as known at that time, and here, surely, there was. I'm having the same trouble Judge Reimer is having, that given the facts that the insured, whose assignment you have received, acted in a willful and organized fashion over a period of at least an hour, and did all the things that she referenced in her question, plus asked to borrow a weapon from a border officer, in addition, leads me to conclude that the insurer was in possession of substantial, I would say overwhelming evidence that the acts done here were intentional criminal acts, which I think brings it within the exclusion of the homeowner's insurance policy. Well, Your Honor, let's look at the acts individually now, and look at them in terms of the various questions that have to be asked. Do we look at them individually, or do we consider the totality of all the facts that were known to the insurer at the time it made the coverage decision? Your Honor, for the purpose, certainly, of deciding whether there was coverage, you have to look at the throwing of the gasoline and its ignition separately, because the cases say that you can engage in very dangerous conduct, such as throwing gasoline on someone. But if the ignition of that gasoline is accidental, or if it's done in self-defense, and there was evidence of both possibilities here, then it's, then, still, then the injuries resulting resulted from an occurrence, from an accident. That is the law of California. In that case, there'd be an obligation to indemnify in addition to defend, correct? There would be, except, of course, Your Honor, we're just talking about the times as, what was known at the time of the Nile of defense. Now, later on. Isn't it conceded that there, that, in fact, Michigan Millers did not have an obligation to indemnify Mr. Rasich? Yes, Your Honor, the basis of facts learned later on. And how would the world be a different place for Mr. Rasich if Mr., if Michigan Millers had defended him? Well, Your Honor, the plaintiffs had offered to settle the matter for the policy limits of $300,000. If the matter, if they had, if Michigan Millers had undertaken defense and settled the matter for $300,000, then there wouldn't be a $7.5 million judgment against the insurance. So it would be very different. But Michigan Millers only has an obligation to conduct an investigation to the point where it determines that it does not have coverage. That's right. And it's our contention that they did not establish that for a number of reasons. First of all, because of this point that the ignition of the gasoline could have been accidental. The California cases say that you can be speeding while drunk, driving. And still, if you hit another car, that is an accident. Despite the fact that you were acting extremely recklessly and certainly creating an enormous potential for danger. With the fact that he's holding the big lighter in one hand and the big gulp cup full of gasoline in the other. Your Honor, that is not that is not the way the facts are stated at this point. Certainly taken into custody at the border. As I read the record, he was still holding the lighter. Yes, Your Honor. But the but the narratives of the events at that time say that he took out after he threw the gasoline. On one account, he took it out when he saw one of the officers pulling out his gun and therefore acted in self-defense. On the other account, he was pulling it out and it somehow struck something and lit. In either case, that is not a willful injury that results. Let me get back to my earlier question. I grant you that that is a theoretical possibility that that's what the evidence showed. But can't the insurer look at the totality of his conduct, including all the things that he did in the hour or more between his first run in with the Mexican police officers and his setting them afire and conclude that it is virtually impossible for any reasonable fact finder to determine that this was anything other than intentional criminal conduct and thereby properly deny coverage? No, Your Honor, I think they could not, because once again, it's not just theoretical that there was a self-defense contention here. The insured had stated that he acted in self-defense to a number on a number of occasions and the insurer knew that. Now, that's not just theoretical. That's a basis for reasonable belief that a fact finder could conclude that this was an accident. Now, there are some others. There is also the fact that they had information that the insured was not of sound mind and that was not investigated. Now, to what extent was he impaired? Well, they had information that at least a couple of psychiatrists said that he was significantly impaired in how he acted. That, again, raised the question of coverage that was not answered. And he pled guilty after the coverage determination was made. Is that right? He pled guilty. Well, the insurer was not aware of his plea until after they denied coverage. In point of fact, he actually had pled guilty. Is that right? Yes. Yes, he had. And presumably his defense lawyer, in relying on the two consulting psychiatrists, had decided not to pursue a diminished capacity or insanity defense when he was counseled to enter the plea. We can presume that if the insurer gets it right, i.e. there is no duty to indemnify, there is no coverage, what does it matter whether the investigation meets the level of thoroughness that an objective observer would otherwise expect? Well, Your Honor, it's our contention that they didn't get it right in this case as to the duty to defend at the time they denied defense. At the time they denied defense, there isn't just that we're saying, well, the investigation wasn't satisfactory as a matter of principle. No, it wasn't enough to negate the possibility of coverage. There was the possibility of coverage. They knew that he was impaired. They did not establish that he had sufficient mental capacity in order to to commit willful acts. They knew that he had said that he acted in self-defense. They had not established otherwise. But doesn't the insurer then just simply take the risk? If they make a determination that there's no duty to indemnify, and they therefore claim they do not have the duty to defend and do not have a duty to investigate further, if in fact they are wrong in their conclusion, then there are all sorts of bad things that can happen to insurance companies engaged in that conduct. But if in fact they get it right, and it appears that no one can no one contends that there was in fact coverage because the duty to indemnify is not in play here, isn't that sufficient? No, Your Honor. Not under it's very clear under California law that that is not sufficient, that they can't. It's precisely the point of the California law. The policy is stated by the California Supreme Court that they cannot gamble in that manner, that they must defend. And if they don't defend, then they must bear the consequences. Right. They must bear the consequences of their failure to defend a case that ultimately inerts to the detriment of their insurer, where in fact there was a duty. But their duty to defend is only extensive to the point where they have investigated, to the point where they determine there is no coverage, correct? If they have properly assumed there is no coverage, and as our conclusion here, on the basis of these rather uncertain facts, as they were known at the two occasions, on the two occasions which they denied defense, they simply had no basis whatsoever for saying that the potential for coverage was completely eliminated, that it could not arise on any conceivable theory. Very stringent rules, Your Honor, from the California Supreme Court and courts of appeals on this. So your position would be that they would, the insurance company would have had to had the obligation to defend and to settle this case as if they had a duty to indemnify. Yes, Your Honor. Because at the time, they could not definitively establish on the basis known to them that they did not have a duty to indemnify. Well, you say definitively, and I don't know what that means. I, beyond a reasonable doubt, beyond all doubt, by our ponderance, by clear and convincing evidence, where do we draw the line? Well, the language in the California case is, Your Honor, is a language like this. So the question is whether it they don't have to defend if there is no conceivable theory on which there could be coverage. No conceivable or no hypothetical theory. I don't think there is a conceivable theory. Well, Your Honor, I respectfully, I respectfully disagree on the basis that this is a case in which, yes, apparently something was done willfully that created a danger, but then there was there was potential that the danger resulted in harm only because of accidental conduct, including conduct engaged in on the basis of self-defense as to the we haven't really gotten to the criminal act exclusion. But there we would say the criminal act exclusion is ambiguous and it doesn't say whether guilty to creating Molotov cocktails, which he then carried back across the border to Mexico with wicks in the cups and so on that he purchased to use as containers for the gasoline. Yes. Yes, that's true, Your Honor. But that is not the that offense didn't result in the injury here. The criminal acts which are alleged as the basis for for the exclusion are not those criminal acts, Your Honor. Unregistered firearm, which which we know in this case was the creation of a bomb, which is how the the alcohol, tobacco and firearms statutes deal with these sorts of weapons. But Your Honor, I don't see the distinction. Well, he was not he was not prosecuted. First of all, at the time defense was first denied, it was not known at all that he had pled guilty. So that doesn't come into the picture. And he was not charged by criminal complaint in the Southern District of California with all those charges. That's right, Your Honor. But the question is more than he pled guilty to. The question is, Your Honor, but not first of all, not the charges that led to the injury here. And secondly, secondly, the question is, what does that criminal act exclusion mean? There are policies that flatly say exclusion for criminal acts, whether there has been a conviction or not. This policy does not say that. We contend, Your Honor, on that basis that it was ambiguous and therefore inapplicable here. I just have a minute or two. I'd like to reserve it for response. Thank you. Good morning. Mitch Tilner for Appellee Michigan Miller's Insurance Company. I would like to address three points. First, was there a potential accident here? Secondly, was coverage conclusively barred by the criminal acts exclusion? And third, did the denial of the defense cause any injury? Would the world have been any different had the company defended for that brief period until Mr. Resich was sentenced for to 10 years in prison? First on the issue, was there a potential accident? Mr. Gerstein has argued about theoretical, hypothetical possibilities. It might have gone down this way. This might have happened. California law is very clear. The insured may not speculate about possible facts in order to create a duty to defend. Any facts are possible. You can always speculate. The court in Industrial v. Computer said a clever insured can always come up with a scenario for which the injury was actual. But that's not California law. We look at the facts that were presented to the insurance company, not theoretical possibilities. The facts in this case that were presented to the company, which it had on its desk when it denied the defense, were the criminal complaint filed against Mr. Resich, which included a detailed statement of facts tracking his confession. They had the plaintiff's civil complaint against him, which alleged that he drenched them with gasoline and set them on fire. The company had the district court's detention order in the criminal proceeding, which included detailed findings of fact about what he did. Again, tracking his post-arrest confession. And the company had Mr. Resich's own post-arrest statement about what he did, which he never recanted and never contradicted. These materials established that he felt he had been ripped off, quote, by the Mexican police. He concocted an elaborate scheme to retake his money by force. And pursuant to that scheme, he went back to the United States. He purchased the lubricant WD-40, which he said he intended to use as mace. He purchased gasoline, which he said he intended to use to blind the police officers. He prepared Molotov cocktails. They were found in his truck at the time of his arrest. He pretended to have car trouble in Mexico to lure the police officers close, so that he'd be able to douse them. He pretended to drink from the cup full of gasoline, so they wouldn't suspect what he was about to douse them with. He had gasoline from the cup in an attempt to blind them. This is his post-arrest statement. And then he used a Bic lighter to ignite the gasoline. He says in his post-arrest statement that he lit the fire because he saw one of the police officers reach for a firearm. Michigan also knew that Mr. Raycich had entered a plea to a federal crime. Michigan did know that. The information they had was not exactly accurate. They thought he had entered a guilty plea. In fact, he pled no low contender to the federal crime of manufacturing an unlawful firearm. They also knew that he was incarcerated in federal prison. At the time, they denied the defense. And they knew he would likely be incarcerated for ten years. That is what their attorneys told them. And in fact, 35 days later, he was sentenced to ten years. So there is no possibility on these facts that these injuries were inflicted by accident. Under California law, a deliberate act is not an accident. It doesn't matter whether the insurer intended injury or whether he intended one injury and actually inflicted another. If he acts deliberately, it is not an accident. Now, plaintiffs speculate about the lighter might have hit something. In fact, when they interviewed Mr. Raycich in March of 94, before they denied the defense, Mr. Raycich at that point, one and a half years after the incident, said he didn't recall how the lighter lit. Okay, he doesn't recall. That has nothing to do with the actual picture. He said he didn't recall. In fact, a few hours after the events in question, he recalled very clearly, and he explained to the federal agents exactly what happened. With respect to the possibility of self-defense, the facts viewed in totality in the real world foreclose any possible claim of self-defense in this case. He went to the United States. He was at a place of safety. He could have gone home. What does he do instead? He makes the Molotov cocktails and drives back to Mexico with the intent of blinding these officers. He douses them with gasoline. He's got his BIC lighter in hand. That is not a self-defense situation because self-defense is not available when you initiate the violent confrontation. And there's no doubt he did that here. Mr. Gerstein said that the insured asserted self-defense on a number of occasions, that's not exactly accurate. But in his statement to the federal agents, he did say that he pulled the lighter out when he saw the officer reaching for a firearm. That was the only indication from Mr. Rasich that there might have been a self-defense claim in theory. When he was interviewed later, he did not recall how the lighter got lit. But at that point, he had already thrown the gasoline, right? That is correct, Your Honor. So how can that give rise to a self-defense claim? You're right, Your Honor. It could not. It would certainly not. He committed felony assault by throwing gasoline, whether lit or unlit, on the officers and then claims self-defense because an officer goes for his gun? It makes no sense, Your Honor. I agree with that. Murr, looking at the facts that Michigan Millers had, the same facts were before the district court on June 4th, 1994. When it sentenced him to ten years. And looking at the same facts that Michigan Millers had just reviewed in making its coverage determination, the district court said any claim of self-defense was, quote, completely untenable, as Mr. Rasich, quote, could not have reasonably believed that he was in immediate danger of unlawful bodily harm and that the use of force was necessary to avoid this danger. Rather, the court says, Mr. Rasich set the train of events in motion by returning to Mexico for the express purpose of confronting the police officers. Turning to the criminal acts exclusion, which is an alternative ground for affirmance, the court need not reach the ground if it agrees there was no accident. But if the court does reach the ground, it should hold that the coverage was excluded because of the criminal acts exclusion. This bars coverage for bodily injury, which may reasonably be expected from the criminal act of the insured. It's an objective test, reasonably be expected. It's not what this particular insured thought might happen, nor does it turn on whether the insured knows his act is unlawful. Rather, the exclusion requires that we look at the type of criminal act and the damages that would reasonably be expected to flow from that type of act. Here we have the criminal act of dousing the officers with gasoline and lighting the lighter. Burn injuries would reasonably be expected to flow from that criminal act. Mr. Gerstein argued that the exclusion may be, and it does not matter whether a conviction is required. Our brief addresses that argument, it cites the Allstate versus Raynor case in which that precise question was addressed, and the court said there's no ambiguity. You read this exclusion, you know that if you commit a criminal act,  then that act will be excluded from coverage. It does not require that there be a conviction, and it's not ambiguous in that respect. That was the Raynor court. And finally, let's look at the question whether the world would have been any different had Michigan initially defended Mr. Rasich. Mr. Gerstein argued that the world would have been different because Michigan might have settled the case and spared the insured from the later judgment against him. That is belied by the record. Michigan did receive a policy limits settlement demand from the plaintiffs. Michigan rejected the demand. It would not have settled, it didn't settle when it had an offer. There's absolutely no reason to think it would have settled had it been defending. The world would not have been any different. Michigan denied the defense on May 3rd, 1994. 35 days later, June 7th, 1994, the district court sentences him to 10 years in prison, and makes detailed findings in a 39-page sentencing order, supplemental excerpts of record 18, which when you read it, leave no doubt that this was all a deliberate and there was no accident. So even if the company had been defending him in early 94, by the time it gets to June 7th, and the district court enters its order, the company can now read exactly what happened. It can see there's no possibility there's an accident, and it can withdraw from the defense. The trial against Mr. Rasich did not proceed until 18 months later. So the world would have been precisely the same had the company defended. For all these reasons, the judgment should be affirmed. Thank you. All right. Thank you, Your Honor. Just very quickly, Your Honors. First of all, as to the self-defense issue, once again, it was not theoretical. It was based on statements by the insured. And even unreasonable self-defense makes the injury into an occurrence, an accident, under California law. Secondly, I point out the Rayner case with regard to the ambiguity of the criminal act exclusion is a Washington state case. Only suggestive here, but we argue not good authority, not well-reasoned. As to finally, as to whether the world would have been different if they had defended. Well, of course, they denied the defense, and they also refused the offer. We're saying that both of those things were part and  So it's a reasonable decision. It's bootstrapping to say because we denied the offer, it wouldn't make any difference that we denied the defense as well. They shouldn't have done either. There was a possibility of coverage here. They should have defended. Thank you, Your Honor. Thank you, Mr. Gerstein. Thank you, counsel. The matter just argued will be submitted.
judges: Rymer, Tallman, Leighton